

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00032-CV
_____

IN THE INTEREST OF C.S. AND A.S., CHILDREN

On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 21C0139-CCL

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

When Mother's child from another marriage, E.V., was detained for breaking into a church and stealing food, he said he was hungry. E.V. explained that he had had food withheld from him as a form of punishment and that he had sixty days of a ninety-day punishment remaining.[1] E.V. reported that he was also punished by completing extra chores, doing military-style workouts, sitting on a bench for extended periods of time, and being spanked with different objects, including a stick with thorns on it, phone chargers, paint sticks, and a paddle. Further investigation by the Child Protective Services (CPS) division of the Texas Department of Family and Protective Services indicated that Mother and Father's other children, C.S. and A.S., witnessed E.V. being punished and that they had received the same kinds of punishment. Because of the excessive and unusual punishment of the children, they were removed from Mother and Father's home.

About fourteen months after the children were removed, the trial court determined that termination of Mother's and Father's parental rights was in the best interests of C.S. and A.S. and terminated Mother's and Father's parental rights to C.S. and A.S. on four grounds set out in Section 161.001(b)(1), subsections (D), (E), (J), and (O), of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (J), (O). On appeal, Father[2] asserts that the evidence is legally and factually insufficient to support the trial court's findings on statutory grounds D, E,

---

[1]We refer to the children who are the subject of this case by their initials, their birth parents as Mother and Father, and their other relatives by pseudonyms. *See* TEX. R. APP. P. 9.8.

[2]Mother's parental rights to E.V. were terminated under a separate order of the court. Mother has not appealed that order.

2

and J and that the evidence is legally and factually insufficient to support its finding that termination of his parental rights was in the children's best interests. Because we find that sufficient evidence supports the trial court's finding under statutory ground D and its finding on the children's best interests, we affirm the trial court's judgment.

*Standard of Review*

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "This Court is . . . required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of

3

proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *In re H.R.M.*, 209 S.W.3d at 108). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or

4

conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)). "'[I]n making this determination,' we undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 503). "We also recognize that the trial court, as the fact-finder, is the sole arbiter of a witness' demeanor and credibility, and it may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.).

*Sufficient Evidence Supported the Statutory Ground D Finding*

Father asserts that the evidence is legally and factually insufficient to support the trial court's findings under grounds D and E. "Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied)). Even so, when the trial court's findings under grounds D or E are challenged on appeal, due process demands that we review the evidence supporting the findings under at least one of those grounds when they are challenged on appeal.

5

*See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) ("We hold that due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code."). This is because termination of parental rights under these grounds may implicate the parent's parental rights to other children. *Id.* at 234; *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (providing as a ground for termination of parental rights that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)").

"Termination under Ground D is proper when there is clear and convincing evidence that a parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re D.R.*, 631 S.W.3d 826, 833 (Tex. App.—Texarkana 2021, no pet.) (quoting TEX. FAM. CODE ANN. § 161.001(b)(1)(D)). "Under [Section 161.001(b)(1)(D)], we must examine the time before the child[]'s removal to determine whether the environment itself posed a danger to the child's physical or emotional well-being." *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.). "A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards." *In re N.B.*, No. 06-12-00007-CV, 2013 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.). "[S]ubsection (D) permits termination [of parental rights] based on a single act or omission [by the parent]." *In re L.C.*, 145 S.W.3d at 797; *see In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). "[A]busive or violent conduct by a parent or other resident of a child's home can

produce an environment that endangers the physical or emotional well-being of a child." *In re B.E.T.*, No. 06-14-00069-CV, 2015 WL 495303, at *5 (Tex. App.—Texarkana Feb. 5, 2015, no pet.) (mem. op.) (quoting *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied)).

In this case, the evidence showed that Stevie Stanley, an alternative response caseworker with CPS, received the report of E.V.'s break-in at the church to steal food. E.V. told the police of the various punishments. Stanley testified that, when she spoke with E.V., he was very guarded, quiet, and withdrawn, even though he had a normal I.Q. when it was tested. She opined that he had endured so much trauma that he exhibited selective mutism. She also said that E.V. was very thin and that, after eating three meals a day in detention for a week, he weighed only 103 pounds and had a body mass index of 4.43.[3]

Forensic interviews were also conducted of C.S. and A.S., who were ages nine and six at the time. C.S. and A.S. corroborated E.V.'s statements as to punishment and said that they saw him being hit with a paddle on different parts of his body and saw his hands bleeding and his body bruised as a result. They also said that they had been hit with paddles, sticks, and paint sticks and that, when E.V. got in trouble, they got punished too, so if E.V. did not get a meal, neither did they. C.S. and A.S. also reported that there was a lock on the refrigerator that came off only after E.V. went to juvenile detention. In addition, they said that, if they got a meal while E.V. was there, it was usually cereal. They also talked about military-style workouts—burpees,

---

[3]E.V. was five feet, seven inches tall and was fourteen years old.

crabwalks, and pushups—that they would have to do for hours at a time and that E.V. would have to do from morning until night.

In his Children's Advocacy Center (CAC) interview, C.S. said that, one time, he was spanked with a paddle and it hit his "pee wiener" and he had blood in his urine. When he told Mother, she said he should have bent over. He also said that, on the day of the interview, he had already had to do 100 pushups because he had been sitting on the couch and Mother said he had thrown something when he was supposed to be sitting still. C.S. and A.S. both talked about being spanked with sticks with thorns in them and a paddle and about each having marks and bruises in different areas. They both witnessed E.V. being physically punished and his hand bleeding. A.S. also witnessed E.V. being hit with the paddle on his arm repeatedly until Mother did not feel like hitting anymore, because he would not say, "I will not steal."

Stanley went to E.V.'s house where she met with Mother, who carried a gun on her hip. Mother told her that she had tried different punishments with E.V., and nothing worked, so she began withholding meals from him. She described E.V. as a problem child and told Stanley that he stole paper clips and binder clips and played in the water in the bathroom for long periods of time, causing their water bill to increase. When she spoke with Mother and Father about the allegations of physical abuse of E.V., they both said that they tried different punishments on E.V. and that he would not learn. Stanley testified that there was no indication of remorse from either parent and that they did not accept any responsibility for any injuries to the children.

Stanley also testified that the boys were not in public school and had not been there since May 2020. The boys said that they were in homeschool but had not started for the year as of the

8

time of Stanley's investigation in January 2021. Mother said that she had homeschool curriculum, but she did not show it to Stanley.

Stanley testified that, based on her investigation and interviews, she believed that C.S. and A.S. were placed in a situation that was a danger to their physical and emotional well-being. As a result, C.S. and A.S. were removed from the home because of physical and emotional abuse. She also testified that, when CPS went to remove the boys, Mother stated that she felt like E.V. had not been punished enough.

Demetris Simington, the CPS caseworker in this case, testified regarding the parents' compliance with their family service plan. She testified that, although Mother and Father had completed most of the services under the plan, they had attended only two individual counseling sessions. Under the plan, they were required to attend twelve sessions, more if required by the counselor.

Simington also testified that she provided the boys with services and talked with them, their placements, counselors, and caregivers. She noted that, at the family conference, Mother and Father attributed the case to E.V.'s bad behavior rubbing off on the two younger boys and added that Mother and Father could not say anything positive about E.V. She also testified that she had never heard Mother or Father express any remorse for the way they had treated the boys.

When Simington first talked with E.V., he had to think about how to respond to questions. According to Simington, E.V. eventually told jokes and was very talkative, and she had never felt threatened by E.V. or worried that he was going to hurt anyone. She also testified that E.V. was very protective of his brothers. Both C.S. and A.S. were receiving counseling, and

9

Simington received reports from their counselor. She said that the boys constantly talked about their parents being mean, discussed the punishment, and wanted to know why they treated them the way they did. She also noted that, when the boys came into care, they were not on the proper grade level for their age. Although A.S. had to be held back, C.S. advanced to his proper grade level after being removed, and E.V. jumped from seventh-grade to ninth-grade level.

Simington recommended termination of Mother's and Father's parental rights based on Mother and Father not completing their services and from information gained from time she had spent with C.S. and A.S. She testified that C.S. and A.S. feared going back home with Mother and Father. They were adamant that things would not change and that they did not feel safe at Mother and Father's home.

Suzanne Tomlin, a licensed professional counselor, had counseled C.S. and A.S. two times a month since June. She testified that they talked extensively about the food situation, the lock on the refrigerator, often not having three meals a day, and sometimes having from none to two meals in a day.

They both witnessed E.V. taking the brunt of the physical abuse. As a result, Tomlin opined, C.S. and A.S. had a lot of fear. They repeatedly and adamantly told her that they did not want to go home because of that fear. Tomlin also opined that the boys came from a traumatic background and that witnessing E.V. being punished was emotionally damaging because they would not know when it would happen to them.

Tomlin also testified that both C.S. and A.S. had attention deficit/hyperactivity disorder (ADHD), that C.S.'s behavior at school was good, but that A.S. needed a lot of prompts and

10

reminders to stay on task. She testified that the ADHD brought anxiety and that witnessing E.V.'s punishment increased the anxiety and put their emotional well-being at risk. She also noted that C.S. and A.S. both told her that they received the same punishments as E.V., with a lot of "whippings" with different objects, denial of food, and not going to school. C.S. told her about being hit in his private parts, which caused blood in his urine.

Tomlin opined that, if C.S. and A.S. were reunited with Mother and Father, the children would experience regression with anxiety and physical aggression. She also testified that she had never heard C.S. or A.S. say that they loved their parents, missed them, or wanted to spend time with them.

Mother testified that the boys had been in public school until COVID-19 hit and that she had kept them home when the schools opened again because she disagreed with wearing a mask, social distancing, and the vaccine. She maintained that she was going to homeschool them, but gave them an extra break and had not started when they were removed.

She also testified regarding E.V.'s history of bad behavior: not talking, throwing tantrums, pushing and hitting other children, and stealing. She said that she had tried standing him in a corner, writing sentences, corporal punishment, paddling, and whipping with a belt. She admitted hitting C.S. in his privates, but said it was because he refused to bend over and turned as she was swinging the belt. She also said that the same thing had happened to E.V., also with a belt. Mother also admitted to using military-style exercises as punishment, but maintained it was mainly pushups for C.S. and A.S. She said those were not as severe as for E.V. and that the number of pushups depended on the severity of what they did, but she admitted that she had

11

required them to be done all day. She also admitted to paddling all three boys with paddles, paint sticks, and belts. Mother also testified that she had told the investigator that she had withheld meals from the boys on a couple of occasions.

Mother also maintained that there was always food in the pantry and plenty of cereal for E.V. to eat, so she did not believe that E.V. broke into the church because he was hungry. She agreed that she and Father had rules of conduct and discipline in their house and believed that the boys resented those rules.

Mother also testified that Father was a truck driver and that he was usually gone six weeks at a time. However, she talked with him every day, and he knew everything that went on in the house.

Father testified that he believed he had "screwed up" one time in his discipline of E.V. He stated that he lost his temper as a result of E.V.'s running away, breaking into his neighbor's house, and vandalizing it.[4] He spanked E.V. with a paddle so hard that he bruised his buttocks to where it would hurt him for at least two or three days and up to a week. He attributed his actions to a culmination of years of having problems with E.V. He also testified that he felt the corporal punishment and other punishments that had been testified to were appropriate and that they did not create harm. He maintained that his preferred discipline was to talk about the problem but that, if talking did not work, he would try timeouts and finally "all in all" ending with corporal punishment.

---

[4]Father said that E.V. admitted to the vandalism because he was silent when asked if he had done it.

12

Father also maintained that E.V. broke into the church because he did not like his parents' rules, not because he was hungry. He said that they had a refrigerator and freezer full of healthy food and that E.V. had access to crackers, canned goods, and tuna. He stated that E.V. broke into his neighbor's house in December before the boys were removed and that he knew it was E.V. because of E.V.'s routines and reticence. He agreed with Mother's testimony and stated that E.V.'s punishments were strong because they feared for their lives and others' lives because E.V. was stealing their car keys. He also testified that, although he was on the road for six to eight weeks at a time, he maintained contact by telephone quite often and sometimes was on the telephone with someone at the house for four to seven hours.

Joey Elliott was the court appointed special advocate for C.S. and A.S. since February 2021. She testified that she visited Mother and Father in their home early in the case. They only wanted to talk about how awful E.V. was and how it was all his fault. At the end of the visit, Father brought her attention to several guns that he had, showed them to her, and told her why he carried them. Mother then displayed her gun and said that she always carried it because they believed in protection. Elliott left shortly after that and did not return to their house.

She visited with Mother and Father several times at the courthouse after the initial visit. Each time, Mother and Father continued to tell her that they saw nothing wrong with how they disciplined the boys. Father also told her that he had been raised that way. Elliott testified that she had not heard any remorse or regret from Mother or Father throughout the case and that they never said anything positive about E.V.

13

Elliott also testified that she had visited with C.S. and A.S. at least once a month since she was assigned to them. They told her at each visit that they did not want to see, visit, or talk to their parents and that they did not want to go home. When she asked them what they wanted to tell the judge, C.S. said he wanted to know if his parents were still mean, and A.S. wanted to know why his parents were mean for so long.

Regarding the changes she had seen in the children, Elliott testified that both C.S. and A.S. had nightmares about getting hurt when they first came into care, but that those had become less frequent. Also, at first, they did not communicate very much, but they eventually came to communicate better and speak more clearly. She also testified that both C.S. and A.S. were quite behind in school, but that both ultimately made it on the A-B honor roll with good conduct awards. Also, at first, they did not know how to interact with other people and honored no boundaries, but they grew to have good manners and knew how to sit quietly in school. She also testified that they were happy, tall, and healthy, were eating healthy meals, had lots of friends, and were involved in church and in the community.

Elliott also testified that C.S. and A.S. had talked about seeing what happened to E.V. and that this had affected them emotionally so that they did not want to go home. She said that their counselor was concerned that, with E.V. out of the picture, if they were sent back home, either C.S. or A.S. would become the new focus for punishment. Elliott opined that the environment that C.S. and A.S. were in before removal was emotionally damaging and that their physical well-being was in danger. Her greatest concern with returning the boys was that Mother and Father did not finish their counseling and exhibited no remorse.

Father argues that, since the Department did not show that C.S. and A.S. lived in squalor, that Father used illegal drugs, or that he allowed dangerous conditions around them in the home, there was no evidence that their environment endangered C.S.'s and A.S.'s physical or emotional well-being or that Father's conduct was the root of such an environment. While we agree that such conditions can create an environment that may endanger the physical or emotional well-being of a child, they are by no means the only ones that can create such an environment.

As we have previously noted, "abusive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional well-being of a child." *In re B.E.T.*, 2015 WL 495303, at *5 (quoting *In re B.R.*, 822 S.W.2d at 106). The evidence in this case showed that, before removal, C.S. and A.S. had witnessed Mother's and Father's brutal treatment of E.V., both by extreme corporal punishment and the withholding of meals for extended periods of time, and that they had suffered similar punishments themselves. This conduct produced an environment that caused C.S. and A.S. to fear their parents to the point that, even a year after removal, they feared being returned to Mother's and Father's care and had no desire to have any contact with either parent. Although the evidence indicated that Mother was the primary person responsible for those punishments and the resulting endangering environment, the evidence also showed that Father was aware of her disciplinary methods, agreed with them, and also employed them himself. Further, although Mother and Father disputed the statements made by E.V., C.S., and A.S. regarding the severity of the punishment inflicted on them, the trial court, as fact-finder, could have reasonably discounted their testimony in light of E.V.'s physical condition and the emotional condition of all of the boys at their

15

removal. Under this record, we find that the trial court reasonably could have formed a firm belief or conviction that Father knowingly placed or knowingly allowed C.S. and A.S to remain in conditions or surroundings that endangered their physical or emotional well-being. Therefore, we find that legally and factually sufficient evidence supports the trial court's finding terminating Father's parental rights under statutory ground D.[5] We overrule this issue.

*Sufficient Evidence Supported the Best-Interest Finding*

Father also challenges the legal and factual sufficiency of the evidence supporting the trial court's best-interest finding. "There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of the child, courts consider the following *Holley* factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

---

[5]Because only one statutory ground finding is necessary to support a judgment of termination and our finding that sufficient evidence supports the trial court's finding under statutory ground D satisfies the requirements of due process and due course of law, we need not address Father's challenges of the trial court's findings under statutory grounds E and J. *See In re L.E.S.*, 471 S.W.3d at 923; *In re N.G.*, 577 S.W.3d at 237.

*Id.* at 819 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). There is no requirement that all of these factors be proven in order to terminate parental rights. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *Id.* at 28.

Although C.S. and A.S. did not testify, several witnesses testified regarding their statements and feelings about being returned to their parents, as set out above. This evidence strongly supports a finding that C.S. and A.S. did not desire to return to Father's care.

Even though Father had completed parenting classes, Father and Mother had completed only two counseling sessions. Based on the evidence set out above, it was reasonable for the trial court to conclude that there had been no, and would be no, change in the conditions of Father's home that had led to the removal of the boys.

Consequently, it was reasonable for the trial court to conclude that Father would not be able to meet the boys' emotional needs, that returning the boys to Father would present an emotional and physical danger to the boys, that Father was lacking in his parental abilities, and that his lack of remorse for, and his lack of understanding of, the emotional and physical consequences of his and Mother's punishments of E.V., C.S., and A.S. indicated that the parent-child relationship was not a proper one. We find that this evidence strongly supports a finding that the second, third, fourth, and eighth *Holley* factors favored termination.

We find that legally and factually sufficient evidence supported the trial court's best-interest findings and overrule this issue.

17

For the reasons stated, we affirm the trial court's judgment.

Josh R. Morriss III
Chief Justice

Date Submitted:     August 8, 2022
Date Decided:       August 16, 2022